This is Nancor Corporation v. JPMorgan Chase Bank, 2090179. We have Mr. Swilford for the appellant and Mr. Boley for the appellee. Good morning. Mr. Swilford?  I do represent JPMorgan Chase Bank and two of the main issues in this case revolve around paragraph 10E of a sales contract whereby the bank sold a building to the plaintiff, Nancor. And in that contract, and in that paragraph, Nancor acknowledged that it had fully examined the premises, it was fully satisfied with the condition of the premises, it is as self-willing to accept the premises as is, and that the only representations it was relying on were those in the sales contract. Can a clause like that, though, an as-is clause we've inspected, cover what may be considered, and I know that's going to be subject of discussion here, a fraudulent misrepresentation? Well, Your Honor, that is exactly, of course, the big issue because, and the cases around the country differ, although there's certainly no case on point here. But I think you have to remember that while Mr. Priest, the bank's representative, made this, or what the jury found to be a misrepresentation about the tear-off in the roof, Nancor then turned around and made its own representations in the contract. And to not enforce that contract, 10E, you're basically saying that the buyer can make misrepresentations in the contract. And this isn't like a consumer situation where you have adhesion contract. This is between two big corporations. The contract terms were negotiable. There was all this time to examine the property, and despite all that, Nancor signed this contract in which it made representations which now turned out to be misrepresentations themselves. Because, you know, before in the contract they represented, they were willing to take the property as-is. And they come before it and they say, well, no, we're not bound by that representation. So why should my client be bound by that? But would their representation, since they were not responsible for putting the roof on, would their representation have to be construed as they pulled up that roof all over the place and found that it was, in fact, a tear-off? I mean, how can – I mean, there's some logistic problems here for Nancor and what they could do. This is – they have the ability – they could have – first of all, it wouldn't have been that difficult. I'm somewhat bound by the jury's findings, although I think they defy common sense in some regards. Because when you have a roof on top of a gravel roof and you have the old flashing on there, somebody ought to have been able to see it. But it wouldn't have been able – it was easy to see just by removing one of the vents on the roof if they wanted to inspect it. It's not like it was so hidden they could never find it. A roofing expert, had they hired one, could have easily found this. They didn't hire a roofing expert to go over the roof. In the initial stages when they were negotiating. That's correct, Your Honor. Or within the 30 days that they had after the signing. Yeah, really. They had 30 days kind of cart watch after they signed this contract to go out there. And all they had to do was not disturb the tenants, you know, the current tenants' business. They could go out there any time just by appointment. And they did go out there. I mean, they spent a lot of time out there. They didn't spend enough time on the roof, obviously, but they had the opportunity to do it. And they said they were fully satisfied with the condition of the property. Excuse me, Your Honor. I'm sorry, I interrupted you. Should they have 10 years to do that? Well, I guess that's a thrust of what their case would be, although this happened two years after the purchase. But yes, I guess under the statute of limitations, if they're allowed to proceed with this case, that's what the gist of, and for their position, that would be the gist of the decision. Yeah, that they would have 10 years to do that. The sale was for $1.3 million, is that correct? The $1.3 million, yes, Your Honor. The damages that were awarded for replacement of the roof was $1.2 million? That's correct, Your Honor. So the roof was worth 90% of the building and the real estate? Well, that's what the jury found. But I think this is one of these cases it's very hard to come in here and argue against the amount of a verdict. But in an economic loss case like that, with those contrasting numbers, and you cannot relate that $1.2 million to any of the evidence in this case because the plaintiff said, accepting their theory, that they'd have to replace not only the roof but the roof deck, that was going to be $2.1 million. And whereas the only evidence in the record as to what a tear-off roof would cost were the estimates that the bank received when they sold the property, and that was like $163,000 to tear off the roof and put it back on. And there's just no economic theory in the evidence. How much would it have cost to tear down the entire building and put up a new building? Well, I like that question, but I don't think there's no evidence. Well, I have had some experience in real estate law. Okay. Working for the title company for 14 months, a long, long time ago. And when you have an encroachment, sometimes the encroachments are removed, sometimes they're not. It all depends on the amount of money that's involved. And so I'm just curious as to whether or not it would have been cheaper just to tear down the whole building, put up a different one. There was no evidence of that. There is no evidence of that. You could theorize that. I mean, when you think about damages, there's another way to look at this case and how excessive the verdict is, is that, you know, if they'd sit on a precision theory, they would have gotten $1.2 million back and the bank would have had its building back. And it wouldn't have been anywhere near as worse off as it is now with this verdict. And I'm kind of going far afield, which is to put the whole thing in perspective as to how out of line the verdict is. You started your oral argument, I think, with the suggestion there should be a reversal. But you didn't really address whether or not it was fair to exclude the as-is evidence from the jury such that maybe there should be a new trial, and the as-is evidence should be presented to the trier of fact and let the trier of fact decide as between the competing representations, both written and oral, which one should judge to nominate or gravitate toward. Well, you're right. I did say that this paragraph bared on two issues. And our follow-back position is I don't – I know I dropped a rule, as she did, excluding the as-is provision because she felt bound by the Bower case or Bair, however you pronounce it. But I don't see how you can have a – the as-is provision to me seems so important that the jury should have been able to consider it. Now, I don't know any – the rationale in Bower as to why they couldn't – why it couldn't be considered by the trier of fact is there was a state law that said that the pre-sale disclosure regarding, you know, the leaky basement was required. And so if they added the as-is clause, they'd effectively, you know, been superseding the statute. But we don't have any statute in this case, and I think it was very unfair. If the court's not willing to enter judgment as a matter of law, which I really think it should, it was very unfair not to let the jury consider this. And I can't imagine how, if that is there, it wouldn't prejudice my client. I mean, if we made a misrepresentation like the jury found, we did. But NAPCOR made its representations, too, and the jury should have been allowed to consider that. One other thing, since I have so many questions, I've gotten covered most everything I have to say except for one more thing. There are these cases that refer to this as an exculpatory clause, and this is not an exculpatory clause, regardless of what Zimmerman says. That's the First District case. An exculpatory clause, in all cases that Zimmerman happened to rely on, is where somebody tries to absolve themselves of fault for future misconduct. And that is fundamentally different than the case we have here, where the bank wasn't trying to absolve itself or anything it did in the future. It was just trying to fix the party's rights as of the day of the sale in a situation where the plaintiff had an ability to protect itself, where these two commercial entities had an ability to determine who's going to take what risk. And the bank did make representations in the sales contract that did go to the condition of the building with regard to electricity, plumbing, HVAC. And if any of those things not worked, the bank would have been on the hook. Okay? But they made no representations with regard to the roof. I mean, the parties, commercial parties, should be free to contract and divide whatever risks they want and just totally ignore that. Didn't they indicate the roof was under a warranty of some nature? Didn't they actually provide a copy of the paper? The bank, through the realtor, gave NABCOR its dividend warranty. Okay? There are no representations about this as a valent warranty. But that's really sped up off to the side because I can't really say that. What do you mean? If you give somebody a warranty, I guess that's sort of a representation in itself. But the warranty only covered defects in the membrane. And NABCOR's president has acknowledged that he understood that it only covered defects in the membrane. And there's no evidence there was any defect in the membrane. The evidence in this case is the installers screwed the case up. They didn't put enough fasteners in. They didn't put long enough fasteners in. They didn't put the right flashing on. I mean, this was a bad installation. That was the cause of the tear-offs. Put aside the, not the tear-offs, the blow-offs. Put aside the tear-off misrepresentation. If they installed even the wrong membrane, which they did, on this building, if they put enough fasteners on, if they put the flashing on, the roof wouldn't have blown off. What's the effect of life of a roof like this? I'm sorry? What is the effect of life? In other words, with a roof like this, do you have to replace it every 10, 20, or 30 years? No evidence. You're in the real thing. Well, it had been on the building for 35 years, and it probably should have been replaced a few years before, so based on that, I would guess it was about a 30-year life, but that's not the parties they put in. Other than the facts that the building was built in 1960, the roof re-roofed in 1994 when it's in a deteriorated state. That's about the only way I can answer your question. So. All right, Counsel, thank you. You'll have time on rebuttal. Mr. Bowley. May it please the Court. Your Honors, as an initial matter, factually, the bank has continually referred to alleged misrepresentations in their briefs. However, at this point, there are no mere allegations as to the relevant facts in this case. A jury has found, by clear and convincing evidence, and the bank concedes this, that the bank made material misrepresentations of fact to Mr. Janke. The jury also found that those misrepresentations were made intentionally and with the intent to induce Mr. Janke to act. The bank doesn't dispute any of those facts, and they're not an issue on their appeal here today. Despite those undisputed facts, the bank's argument is that, as a matter of law, it should not matter because the exculpatory provision in paragraph 10e of the subject purchase agreement operates to technically nullify finding a fact of fraud. That, however, is not the law in the state of Illinois, and it's not the law in any other jurisdiction in the country. The bank has cited a lot of cases from around the country, but not one of them says what the bank urges this court to hold today. Why couldn't the jury hear about this as-is clause and the argument you're now making? With regard to the as-is clause, number one, it's well settled in our common law in Illinois, and I believe in every other jurisdiction, that the clause in which that phrase was found will not allow a party to escape liability for its own intentional tort. When used as a non-reliance clause, as the bank urges, that's simply legal disclaimer language. That's for a court to take a look at and decide how it's going to be used. It's not a factual matter for a jury to consider, and I think that's what this court found in the Bower case, and that's why this court held that that language does not come in for any reason for the jury. It's for a court to consider. Well, when your client had the opportunity in the negotiations and then the 30-day kind of, you know, period of time, what, if anything, did it do to confirm that warranty or confirm the representations that were made? Mr. Jackie testified at trial, and again, the jury found this, and this is not a disputed fact. I think the bank actually concedes this part in the brief, but Mr. Jackie did undertake a very serious course of due diligence with regard to the property. They did all kinds of inspections. They did all kinds of evaluation of the subject property. Mr. Jackie himself, who does have experience in the construction trades, he owned the construction company, went up on the roof and inspected it, and nothing was found to be amiss. And in the Zimmerman case, there is a holding from the First District Appellate Court, and I think this is reflective of our common law as well, that where a defendant has fraudulently made representations about a subject, a plaintiff can rely on those. He's not held to any higher standard or different standards just because his representations are made. Does that answer your question, Your Honor? Yes, for now. Okay. If I'm correct, weren't Bauer and Zimmerman applicable to residential real estate, and why do you contend that these holdings should also apply to commercial real estate? It is true that Bauer and Zimmerman both arose in the residential real estate context, but we think it's equally applicable to the commercial context or any real estate context. Why? Well, number one, the holding in Bauer was simply, as its language in the written, I'm sorry, the holding in Bauer was that an exculpatory provision like that found in 10E will not absolve a seller for fraud in a real estate transaction. There was no equivocating language as to whether that property happened to be residential or commercial. Also, fraud is fraud. We certainly don't want to see that in the residential context, but we also don't want to see it in the commercial context, especially in today's economic and cultural climate, where the public demand is for more candor and more transparency and more accountability in the commercial realm. We don't want to upend our common law and say, okay, anything goes in a real estate contract. If you have a provision like 10E and every real estate contract has a provision like 10E, you can say anything, you can do anything, you can write anything, and it doesn't matter. You can make any representation that you want. And that's essentially what the bank is urging. But the bank also said that we've got a corporation here and a bank. That's different than, let's say, an individual homeowner and another seller of a home. So I understand where you're going, Your Honor. It's a great question. In this particular case, just so that we can be factually clear, NAPFOR Corporation, well, half of it is here today. It's two people. It's Mr. Janke and his brother. NAPFOR Corporation is nothing like the other commercial entities cited in the cases that the bank talks about. Also, in those cases, all those cases, risk, men, ad, or terror, felony, first of all, they all deal with oral misrepresentations, whereas here we have a written one. Also, the contracts in those cases and also all of the cases cited in the bank's reply brief, all are sui generis. They're made from scratch. These are about stock purchase agreements, securities deals, in one case, purchase of biomedical technology to make artificial bones. These contracts are about very unique transactions. They're arms-length negotiations where the parties sit down and negotiate every possible detail. We don't have that in real estate contracts, commercial or residential. What was the written misrepresentation? The written misrepresentation was that this building came with a tear-off roof when, in fact, it did not. And the reason that's relevant, Your Honor, and I think this might have been what you were getting at earlier, a tear-off roof is when you take the entire roof off and you put a brand-new roof down, and that new roof should last 20, 30 years. A re-roof, which is what actually happened, is when you put a new roof down on top of an existing, bad, deteriorated roof, and the lifespan is significantly reduced. Also, the cost is significantly reduced. This was represented to be a tear-off when, in fact, it was a cheaper and inferior recover. Tell me what the writing was because I thought it was a question and answer that Mr. Priest gave to someone when he said it was a tear-off. I don't remember what the written verification was. Can you refresh my recollection? Yes. Kirk Armour, who was the bank's real estate agent, asked Mr. Priest to describe the property so that he could put this into the real estate listing, as is typically done. One of the things that Mr. Priest represented to Mr. Armour was that this building had a new roof in 1994, a tear-off roof, and that's exactly what went into the brochure, which was mailed out to potential customers. And if I may, getting back to Justice Edhoff's question with regard to how is this case different because it's commercial and those are residential cases, with real estate, whether it's commercial real estate or residential real estate, any of us can be potential consumers for that kind of real estate. In fact, in this case, the brochure that was sent out went via mass mailing to various businesses that might have been interested. In the cases cited by the bank, these securities cases, the pool of consumers is very limited. You can't even receive an offer for a private placement under SEC regulations unless you are what's called an accredited investor. Those are truly sophisticated parties, but anyone can buy real estate, residential or commercial. So I think that's another distinction to make there. Also, with regard to the residential versus commercial context, the property in Bower wasn't just an insignificant residential property. That house sold for $1.7 million at the same time that Mr. Jankin was buying this building for $1.3 million. And I would think that the purchaser of that residential property, I mean, anyone that can go out and buy a $1.7 million residential property is probably a fairly sophisticated individual to begin with. Well, but maybe that person, and this is speculation, made his money in diamonds. One of your clients was in the construction business, which I think puts an interesting spin on this because, as you just indicated and the record indicated, he actually went up on that roof. He looked at that roof. He observed things, whereas counsel for the bank seems to think that there's old flashing. There's, well, it would probably be bent or tarnished.  So why wasn't it obvious to your client who has a specialty in that area? It's a good question, Your Honor. And the reason for that, that testimony came from the bank's own expert, who it's not contested. He didn't get up on top of this roof until 2006, years after the blowoffs and after all kinds of repair efforts have been made. And, you know, when we're in the middle of this litigation and everyone knows that this roof was, in fact, not a tear-off, that's when he said, oh, it's obvious. Well, of course it's obvious at that point. Back when Mr. Jenke was looking at the building, it certainly was not obvious, and we had testimony from our expert to that effect. Moreover, just as a matter of common law, and this also comes out in the Zimmerman case, a plaintiff is not required, if a representation has been made, to, you know, poke holes in a wall to see if a house is actually a gut rehab when someone says, hey, it's a gut rehab. You don't have to poke a hole in every single wall to make sure that, in fact, that's what it is. And this just gets right back to our common law that says an exculpatory provision is not going to shield a defendant from an intentional tort like fraud. What about the actual paper warranty? What, if any, part did this play in this issue? The paper warranty was further inducement to Mr. Jenke that this roof had been laid on or had rather been put on properly and in accordance with the manufacturer's specifications, which were for a tear-off roof, not for a recover roof. But the actual piece of paper didn't talk about a tear-off, did it? No, but the specification that's related to it, and there was testimony to this effect from both experts at trial, was this is the kind of roof that you would get, the kind of membrane that you would get, and I think counsel conceded this earlier, when you were doing a tear-off. It should not be used under any circumstances in a recover kind of situation. So when Mr. Jenke sees this, it's just further inducement. I have a good warranty, manufacturer warranty, and it says that this has been installed properly in accordance with manufacturer's specifications, which would mean a tear-off. It was just further inducement. Right. Some of the first problems occur within a short period of time, over a 10-year span, a short period of time with that first, I think, blow-off, and then there were some other blow-offs. Why, though, do we have an amount that's basically arrived at after 10 years of ownership, 10 years of receiving income? Why are there no set-ups? Why is there no recognition that this building is 10 years older? Well, the bank says that Knapport successfully enjoyed the roof for 10 years. That's not true, and in the record, Mr. Jenke described how this derailed his operation. Every time it rained, people that should be working on manufacturing the company's products and putting up vis clean and doing all kinds of stop-gap measures to prevent any damage or further damage, rather, to the property, to the things they're trying to manufacture, to their office space. I mean it's a nightmare for them every time it rains, and there was ample testimony to that effect and also photographs showing what was going on there. They never got to really enjoy this roof, period, from the get-go. And also getting to, if I may, Justice McLaren's question regarding the price of the property relative to the price of the roof. Knapport paid $1.3 million for that property back in 1996. Before anybody occupied the property, $500,000 of renovations were made to the property, so now it's close to a $2 million property. And, of course, property depreciates over time, and you don't know how much exactly the property's worth today. That testimony was not elicited at trial, but I think it's safe to assume that it's worth more than $2 million. Now, both experts, our expert and the bank's expert, testified that to put a new roof on the property is going to cost somewhere around $2 million. The jury's verdict was actually far less than that, and I would submit not nearly close to the value of the property today or back when it was first occupied. It sounds like they're saying it was a compromise verdict. Perhaps it was, Your Honor. You're right. All right. Close it or leave it? I guess I don't mean that in the literal sense, but I think the jury probably looked at the damages and thought, you know, this is probably what this property is, what it would take to make this roof right, based on the testimony from both experts. We obviously had partisan experts on both sides, as you often do, and the jury looked at that and heard everything. They heard Mr. Jahnke's testimony, and they used their own common sense and their own dealings. Does $2 million have a new roof yet? Not yet, Your Honor, no. But didn't one of the – I think it was the bank's witness – say, well, sure, we could re-roof it, but there's a way to fix it without a total re-roof? That was – and basically you're saying that the jury just wouldn't buy that after this period of time? I think so, Your Honor. I mean, there are two experts testifying as far as different ways that can be applied to fix this roof, and the jury – they heard everything, they evaluated the credibility of the experts, and it came to their decision. I will say, though, that both experts were actually pretty close on all the critical factors as far as how much per square foot and what you need to do with regard to the gypsum deck. I mean, they both understand that with this deteriorated deck, I mean, that's going to have to be part of this replacement. And although they gave a range of figures, I mean, there is some overlap there. Now, there's – some of this roof didn't blow off, and some of this roof is – well, is there anything in the record – are there parts of this roof that are effective and that haven't leaked, or does the record say that every part of the roof that covers this 75,000-square-foot building is leaking? Well, I think it's more of a problem of – you know, this is a roof system, and that's how it's actually referred to. This is what the experts testified to at trial. If – you can't simply pick a discrete area and decide, okay, we're just going to re-roof this spot and that's that. At a certain point, when enough damage is done, you're going – I see I'm out of time, Your Honor. Go ahead and finish the answer, please. But at a certain point, you have to address the entire roof system and also the leakage that's happened that's compromised the deck, and that's, you know, the number that the jury came up with based on the numbers that the experts put out there. And if there's no further questions, Your Honor. Thank you. Thank you, Your Honor. Mr. Slover? Just a few points of clarification, and that won't be long. In 1996, when the roof blew off, when we had the blowoffs, and the experts came in, and this is not disputed, they only found three leaks on the inside of this building, all right? It's also undisputed that the blowoffs affected 5 percent of the roof, although I can understand the verdict for a new tear-off roof. But the verdict here is to replace the entire roof deck when there's only three leaks on the inside of the entire building in 1996, and NABCOR has used this building now for – since 1994 without a new deck. With regard to the condition of the roof and whether it could have been – this defect could have been discovered at the time of the sale, I think Mr. Bolli didn't quite say this, but if there's any – but this is the way I understood it. But it's like only my – only the defense expert, you know, determined that the flashing was bad enough. That's not true. The three reports made in 1996 by people hired by NABCOR all reported that the flashing, the old flashing was not taken out, and new flashing – or rather, just new flashing was placed over it. So, you know – Is that going to indicate something? I'm sorry. Is that going to indicate something specifically? That's just going to – that just relates to whether or not – this isn't like something hidden in a wall that couldn't have been discovered. But even – you know, even if it was, we're still dealing with two commercial entities who were free to tailor this contract any way they wanted to and adjust the risks any way they wanted to. And with regard to – and there are – the cases that I cite in my brief are not misstated at all. They're not oddball outlier cases. If you – in my principal brief, I didn't go outside of Illinois. But NABCOR went outside of Illinois in its police brief, so I responded by going outside of Illinois. You'll actually find law review articles – I mean, this is sort of a – I don't know if it's a – it's a semi-hot issue. And you get cases both ways in the country. So I'll just be frank about that. But I don't misstate the effect of the cases that I have relied on. And they were – they did involve, in some instances, cases where there was a written – alleged written misrepresentation prior to the contract. And the contract later said we're only relying on the representations made in the contract. And in those cases, the plaintiff was held to the representations he made in the contract. Was there evidence that the leaks arose out of the defects in the old roof or that the leaks arose out of defects in the new roof? There was no evidence. I mean, I – Let me give you this scenario. There's no evidence. I mean, for all I know, the three leaks – you know, the water spots in the three leaks could have been there when they wasn't. So what happens if, after 20 years, they decide they want a new roof? And the roof is torn down, or at the time that they decide they want a new roof, they're told that it wasn't a tear-off. And now they say, we want a new roof, but you told us it was a tear-off, and now we're going to have to tear off two layers instead of one. So now we should at least be given some sort of money to cover the tear-off of the roof that was never torn off. Or they could go and say even further, you misrepresented the situation, and now we're entitled to a brand-new roof. Yeah, you're – you know, I – without making – I'm not conceding anything. So my point is, is the misrepresentation, did it result in damages? Because if the misrepresentation was about a tear-off or a lack thereof, and the leaks were caused not by the underlying roof, but by a defective construction of the new roof, then you don't have approximately caused damages. The question then to you is, what was the evidence of record? The evidence of record was that the blow-offs were caused by the inadequate fasteners and the improper flashing. Now, that non-tear-off roof, according to the evidence at trial – and this is, you know, this is plain so expert McBrady said that, that that was the cause of the blow-offs. He didn't say the cause of the blow-offs was that this was a roof over rather than a tear-off roof. So, we can raise this in our – I just – I agree with where Your Honor is going on that. So I'm sorry I'm out of time, but thank you very much for your consideration. Thank you very much, counsel. At this time, the court will take the matter under advisement and render a decision in due course.